**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
Keya C. Denner, Esq. [Attorney No. 0374920004]
Matthew T. Clark, Esq. [Attorney No. 906662012]
Dean Kpere-Daibo, Esq. [*Pro Hac Vice* Movant]
6 Campus Drive, Suite 305
Parsippany, New Jersey 07054
Tel. (908) 758-2785
Email: kdenner@constangy.com
mclark@constangy.com
dkdaibo@constangy.com
*Attorneys for Plaintiff The Cannabis Place 420 Corporation*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **THE CANNABIS PLACE 420 CORP.**,<br><br>*Plaintiff*,<br><br>vs.<br><br>**NEW JERSEY CANNABIS REGULATORY COMMISSION; HARRIS LAUFER in his official capacity as Chair; JACQUELINE FERRARO, in her official capacity as Vice Chair; SEAN KENNEDY, AMELIA MAPP, and KRISTA G. NASH, in thier offical capacity as Commissioners; CHRISTOPHER RIGGS, in his official capacity as Acting Executive Direcotr; DAVE TUASON, in his official capacity as Director, Compliance & Investigations; MEGAN TAGLIAFERRI, in her officical capacity as Director, Licensing; WILLIAM WALLACE, in his official capacity as Director, Labor Compliance and Education; UNITED FOOD AND COMMERCIAL WORKERS, LOCAL NO. 360, JOHN/JANE DOES 1-10, and ABC CORPORATIONS OR ORGANIZATIONS 1-10,**<br><br>*Defendants*. | Civil Action No. ____________________ |

Document Group ID: 93de71df583e44b697b01fbf0e4ec578852e5f7f

**VERIFIED COMPLAINT FOR DECLARATORY RELIEF, TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION**

Plaintiff, the Cannabis Place 420 Corp. ("Plaintiff" or "TCP"), a New Jersey corporation with a principal place of business located at 1542 John F. Kennedy Bouelvard., Jersey City, New Jersey 07305, through its undersigned attorneys, the office of Constangy, Brooks, Smith & Prophete, LLP, asserts the claims set forth herein against Defendants New Jersey Cannabis Regulatory Commission ("Commission" or "CRC"), located at 44 South Clinton Avenue, Trenton, New Jersey 08609, Commission Chair Harris Laufer, Commission Vice Chair Jacqueline Ferraro, Commissioners Sean Kennedy, Amelia Mapp, and Krista G. Nash, Acting Executive Director Christopher Riggs, Director, Compliance & Investigations Dave Tuason, Director, Licensing Megan Tagliaferri, Director, Labor Compliance and Education William Wallace (said individual defendants, together with the Commission, as the "State Defendants"), United Food and Commercial Workers, Local No. 360 ("UFCW Local 360"), John/Jane Does 1-10, and ABC Corporations or Organizations 1-10 (collectively, "Defendants"), and says:

## NATURE OF THE CASE

1. New Jersey law licenses and strictly regulates the cannabis industry. As part of its licensing scheme, the state requires cannabis businesses to sign "labor peace agreements" ("LPAs") with labor unions. It also limits which unions cannabis businesses can sign an LPA with. Additionally, it requires the cannabis business to then negotiate a collective bargaining agreement ("CBA") with the Union within two hundred (200) days of opening. *N.J.S.A.* 24:6I-36(c).

2. Failure to maintain an LPA may result in license suspension, non-renewal, or revocation. The statutory framework significantly limits which labor organizations qualify as "bona fide," thereby restricting the pool of unions capable of executing LPAs.

3. The CRC is threatening to enforce these requirements against Plaintiff by issuing a Notice of Violation ("NOV").

4. TCP employs approximately twenty (20) individuals whose livelihoods depend upon the continued operation of the business and maintenance of its state licenses. [Orduna Decl., ¶ 11.[1]

5. As a result, TCP faces the imminent threat of license non-renewal, regulatory penalties, and the loss of its business operations despite its good-faith efforts to comply with the State's licensing requirements.

6. An actual, immediate, and justiciable controversy exists between TCP and Defendants because the CRC has advised TCP that because TCP cannot meet the LPA requirement, it will provide a license extension temporarily for an unknown period of time while the CRC litigates the *Curaleaf Holdings, Inc. v. New Jersey Cannabis Regulatory Commission* matter in the Third Circuit Court of Appeals, leaving TCP to the mercy of the CRC.

7. TCP faces unknown imminent regulatory action, including denial of renewal, suspension, or revocation of its cannabis license, unless this Court intervenes. TCP's injury is neither speculative nor hypothetical because the CRC has expressly conditioned continued licensure upon obtaining a fully executed LPA despite TCP's diligent but unsuccessful efforts to obtain such an agreement from every labor organization reasonably available in New Jersey.

---

[1] The Declaration of Osbert Orduna is filed herewith. It is hereinafter referred to as the "Orduna Cert."

8. The CRC cannot lawfully enforce the LPA requirement in its cannabis licensing process against TCP. LPAs regulate activity protected under the National Labor Relations Act ("NLRA"), activity prohibited by the NLRA, and activity the NLRA intentionally leaves unregulated. It is therefore preempted and cannot be enforced against TCP. *See San Diego Bldg. and Trades Council v. Garmon*, 359 U.S. 236, 245 (1959); *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Rels. Comm'n*, 427 U.S. 132, 149 (1976); *Hill v. State of Fla. ex rel. Watson*, 325 U.S. 538, 543 (1945).

**JURISDICTION AND VENUE**

9. This action arises under the Constitution and laws of the United States, including the NLRA, 29 U.S.C. §§ 151 *et seq.*, the Supremacy Clause of Article VI of the United States Constitution, 42 U.S.C. § 1983, and the Due Process Clause of the Fourteenth Amendment.

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action presents federal questions and seeks redress for the deprivation of rights secured by the Constitution and laws of the United States under color of state law.

11. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

12. Plaintiff seeks prospective injunctive and declaratory relief against state officials acting in their official capacities to prevent the ongoing enforcement of state licensing requirements that are preempted by the NLRA and that violate Plaintiff's federal constitutional rights. *Shaw v. Delta Air Lines*, 463 U.S. 85, 96 n. 14 (1983).

13. An actual and justiciable controversy exists between Plaintiff and Defendants concerning Defendants' threatened suspension, non-renewal, or revocation of Plaintiff's cannabis

license based upon Plaintiff's inability to obtain and maintain an executed LPA despite Plaintiff's diligent efforts to do so.

14. The controversy is immediate and ripe because the CRC has informed Plaintiff that it will only renew Plaintiff’s license subject to issuance of a NOV.

15. Plaintiff faces imminent and irreparable injury because the threatened enforcement action jeopardizes Plaintiff's ability to continue operating its licensed cannabis business, retain its employees, preserve customer goodwill, and maintain its market presence.

16. The threatened harm is neither speculative nor remote because Defendants have expressly communicated that an executed LPA is required before Plaintiff's renewal application will be processed or approved.

17. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b) because the events and omissions giving rise to Plaintiff's claims occurred in New Jersey, the challenged administrative actions were taken by officials and agencies located within New Jersey, and the cannabis licenses at issue authorize operations within New Jersey.

18. Venue is further proper because the New Jersey Cannabis Regulatory Commission, its commissioners, and its officials maintain their principal offices within the District of New Jersey and perform their official duties in this District.

19. To the extent UFCW Local 360 is named as a Defendant, venue is proper because UFCW Local 360 conducts business in New Jersey, participated in the conduct of the complaints herein, and the acts giving rise to Plaintiff's tortious interference and injunctive claims occurred within this District

**THE PARTIES**

20. TCP, incorporated under the laws of the State of New Jersey, is a Service-Disabled Veteran-owned and Minority-owned business, that is a licensed cannabis operator in the State of New Jersey.

21. TCP operates a fully licensed adult-use recreational cannabis dispensary at 1542 John F. Kennedy Boulevard, Jersey City, New Jersey 07305. [Orduna Decl., ¶ 8].

22. TCP, under its class 5 retail dispensary license, operates New Jersey's largest free same-day delivery service, covering all of Hudson County, and parts of Essex, Passaic, Union, and Bergen Counties. [Orduna Decl., ¶ 9].

23. TCP qualifies as an Impact Zone Business within the meaning of *N.J.A.C.* 17:30-6.5.

24. TCP has invested substantial capital, resources, management time, and labor in developing, operating, and maintaining its cannabis business and relies on its state-issued licenses to continue operating lawfully in New Jersey.

25. TCP that has worked tirelessly to establish itself in the heavily regulated and highly competitive adult-use recreational cannabis industry.

26. TCP is a Service-Disabled Veteran-owned and Minority-owned business, with more than 51% of TCP directly owned, operated and managed by an honorably discharged veteran of the United States Marine Corps who has been issued a Service- Connected Disability Award Letter issued by the United States Department of Veterans Affairs (the "VA"), resulting from his service to our country in Iraq. [Orduna Decl., ¶ 5].

27. The Commission, established by *N.J.S.A.* 24:6I-24, is entrusted with "all powers, duties, and responsibilities with regard to the regulation and oversight of activities authorized [by

Document Group ID: 93de71df583e44b697b01fbf0e4ec578852e5f7f

CREAMM Act]" and oversight of "the development, regulation, enforcement of activities associated with the personal use of cannabis pursuant to [the CREAMM Act]."

28. Defendant Laufer serves, pursuant to *N.J.S.A.* 24:6I-24(b)(1), as the Chair of the Commission.

29. Defendant Ferraro serves, pursuant to *N.J.S.A.* 24:6I-24(b)(1), as Vice Chair of the Commission.

30. Upon information and belief, Defendant Ferraro swore an Oath of Allegiance pursuant to *N.J.S.A.* 41:1-1.

31. Defendants Kennedy, Mapp, and Nash, pursuant to *N.J.S.A.* 24:6I-24(b)(2)(a)-(c), serve as Commissioners for the Commission.

32. Defendant Riggs serves, pursuant to *N.J.S.A.* 24:6I-24(c), as Acting Executive Director of the Commission.

33. Defendant Tuason, pursuant to *N.J.S.A.* 24:6I-34(d)(1)(b), is employed by the Commission as Director, Compliance & Investigation.

34. Defendant Tagliaferri, pursuant to *N.J.S.A.* 24:6I-34(d)(1)(b), is employed by the Commission as Director, Licensing.

35. Defendant Wallace, pursuant to *N.J.S.A.* 24:6I-34(d)(1)(b), is employed by the Commission as Director, Labor Compliance and Education.

36. Defendant UFCW Local 360 is a "labor organization" within the meaning of Section 2(5) of the NLRA, 29 *U.S.C.* § 152(5).

37. Defendants John/Jane Does 1-10 ("Doe Defendants") are currently unknown persons who are officials and/or employees of the State of New Jersey and/or officials and/or employees of UFCW Local 360.

38. Defendants ABC Corporations or Organizations 1-10 ("ABC Corp. Defendants") are currently unknown incorporated or unincorporated organizations who are affiliated with and/or aided and abetted the conduct of Defendants alleged herein.

## BACKGROUND

### A. THE CREAMM ACT AND LPAs

39. In 2020, New Jersey voters approved a voter initiative, Public Question 1, which legalized adult-use recreational cannabis. The initiative also authorized an existing state agency, the Cannabis Regulatory Commission, to "oversee" and regulate the market, which includes creating regulations and processing applications for licensure of cannabis businesses in the state.

40. The following year, the state legislature implemented the initiative by passing the CREAMM Act. Among other things, the CREAMM Act required all adult-use cannabis businesses to obtain a license. *See* AB 21, 219th Leg., Reg. Sess. (N.J. 2020).

41. Under the CREAMM Act licensing scheme, cannabis businesses, including retail facilities, require annual licenses that must be renewed each year. *N.J.S.A.* 24:6I-36.

42. If a license is not renewed, the license holder can no longer operate. *See id.*

43. Under the CREAMM Act, licensing authority is assigned to the CRC and it specifies conditions for the CRC to consider when granting and renewing cannabis licenses. *See id.*

44. As is relevant here, the CREAMM Act establishes:

> The ***commission shall require all applicants for cannabis licenses***, other than applicants for a conditional license for any class of cannabis establishment, or for a cannabis distributor or delivery service, or for either a conditional or annual license for an establishment, distributor, or delivery service that is a microbusiness…***to submit an attestation signed by a bona fide labor organization stating that the applicant has entered into a labor peace agreement with such bona fide labor organization***.

*N.J.S.A.* 24:6I-36(c). *(emphasis supplied).*

45. To obtain and maintain, or to renew, a cannabis license, a cannabis business must abide by and maintain a LPA, which is an "ongoing and material condition of the license." *Id.*

46. If a cannabis business violates LPA or allows it to lapse, CRC can suspend, revoke, or not review a cannabis license because "submission of an attestation and maintenance of a labor peace agreement with a bona fide labor organization…***shall*** be a require for final approval for an annual license." *Id. (emphasis supplied).*

47. Cannabis licensees are also compelled to engage in collective bargaining because "[f]ailure to enter, or to make a good faith effort to enter, into a collective bargaining agreement within 200 days of the opening of a licensed cannabis establishment…shall result in the suspension or revocation of…[the] license." *Id.*

48. Cannabis licensees may not enter a LPA with ***any*** "labor organization," as defined by Section 2(5) of the NLRA, 29 *U.S.C.* § 152(5).

49. Instead, cannabis licensees may ***only*** enter into LPAs with a "bona fide labor organization," which must have: (a) "one or more executed collective bargaining agreements with medical or personal use cannabis employers, in this State or another state;" (b) "a written constitution or bylaws in the three immediately proceeding years;" (c) filed "the annual financial report required of labor organizations pursuant to [29 U.S.C. § 431(b)]" or "at least one audited financial report in the three immediately proceeding years;" and (d) an affiliation "with any regional or national association of unions, including but not limited to, state and federal labor councils" or membership "of a national labor organization that has at least 500 general members in a majority of the 50 states of the United States." *N.J.S.A.* 24:6I-36(c).

50. This criterion functionally creates "most favored nation" status for certain labor organization and prevents any labor organization existing under Section 2(5) of the NLRA, 29 U.S.C. § 152(5) from entering the New Jersey cannabis labor market. Labor organizations which are new, small, or organically formed by cannabis workers are excluded from the New Jersey cannabis labor market.

51. Only a very limited number of "bona fide labor organizations" benefit form most favored nation status. As shown below, the primary beneficiary of most favored nation status is Defendant UFCW Local 360.

52. As further shown below, Defendant UFCW Local 360 has used its privileged position to create an impossible regulatory position for cannabis businesses in New Jersey: either sign a LPA with UFCW Local 360 or one of the very few other "bona fide labor organizations," or lose your license and your ability to operate.

**B. THE CREAMM ACT AND DISABLED VETERAN-OWNED BUSINESS**

53. The CREAMM Act purports to create "unified practices and procedures for promoting participation in the cannabis industry." *See N.J.S.A.* 24:6I-25.

54. This includes a mandate that the Commission issue not less than 15% of licenses to "certified women's and disabled veterans' businesses." *N.J.S.A.* 24:6I-25(c)(1)(b).

55. *N.J.S.A.* 52:32-31.2 limits the definition of "Disabled Veteran" to "a ***resident of this State*** who is certified by the federal Department of Veterans Affairs as having any degree of service-connected disability." *(emphasis supplied)*.

56. The New Jersey Department of the Treasury enforces this statutory requirement, denying direct state Disabled Veteran Owned Business ("DVOB") status to qualifying service-disabled veterans who reside outside the State of New Jersey.

57. TCP's majority owner - - an honorably discharged veteran of the United States Marine Corps and Service-Disabled Veteran - - resides outside New Jersey and cannot submit proof of individual state residency, despite maintaining TCP's principal commercial operations and workforce in Jersey City. [Orduna Decl., ¶¶ 5-6].

58. State Defendants enforce this statutory restriction to exclude non-resident service-disabled veterans from state-created public preference programs, priority queues, and licensing allocations solely based on geographical residency and disability status.

## FACTS

### A. TCP'S LPA WITH UFCW LOCAL 360

59. To satisfy New Jersey's cannabis regulatory requirements, on July 1, 2021, TCP entered into and maintained LPA with UFCW Local 360. [Orduna Decl., ¶ 17; Exhibit A].

60. The LPA was not negotiated; rather, it was presented by UFCW Local 360 as a non-negotiable, "take it or leave it" document. [Orduna Decl., ¶ 18].

61. The LPA was signed without modification and under duress. [*Id.*].

62. The LPA compelled TCP to forfeit its legal right, pursuant to the First Amendment of the United States Constitution and Section 8(c) of the NLRA, 29 U.S.C. § 158(c), to express its views and campaign against unions.

63. The LPA also required TCP to waive, among other legal rights, its ability to have the NLRB conduct a secret-ballot representation election and to fully exercise its property rights.

64. In July 2024, TCP executed a recognition agreement with UFCW Local 360. [Orduna Cert., ¶ 28].

65. Throughout its relationship with UFCW Local 360, TCP consistently made good-faith efforts to comply with its obligations under the LPA and to maintain a productive relationship. [Orduna Decl., ¶¶ 35-36].

66. Despite TCP's consistent good-faith efforts, disputes arose between TCP and UFCW Local 360 as to the parties' rights, obligations, and conduct under LPA. [Orduna Decl., ¶ 36].

67. UFCW Local 360 attempted to improperly leverage the Commissions' regulatory authority during labor disputes. [Orduna Decl., ¶¶ 37-38].

68. On May 2, 2026, based on UFCW Local 360's bad faith conduct, TCP gave UFCW Local 360 written notice of termination of the LPA0 [Orduna Decl., ¶ 39; Exhibit F].

## B. TCP'S EFFORTS TO OBTAIN AN LPA WITH A DIFFERENT "BONA FIDE LABOR ORGANIZATION"

69. Following termination of the UFCW Local 360 LPA, TCP immediately undertook efforts to obtain a replacement LPA with another bona fide labor organization to remain in compliance with the CREAMM Act and preserve its cannabis license. [Orduna Decl., ¶¶ 40-41].

70. TCP specifically discussed executing a replacement LPA with Cannabis Engineers, Extractors, and Distributors Local 420 ("CEED"). [Orduna Decl., ¶¶ 42-44].

71. TCP also used www.newjerseycannabislap.org, a website maintained by Teamsters Joint Council 73, to seek an LPA with a Teamsters-affiliated entity. [Orduna Decl., ¶ 45; Exhibti G].

72. Despite TCP's willingness to execute a replacement TCP was unable to secure an executed agreement from any of those labor organizations.

73. Upon information and belief, UFCW Local 360, directly or indirectly, communicated with other bona fide labor organizations regarding TCP and its efforts to secure a

replacement LPA. TCP alleges, upon information and belief, that UFCW Local 360 used its influence within the New Jersey cannabis labor community to discourage other bona fide labor organizations from entering an LPA with TCP, hereby impairing TCP's ability to satisfy the CREAMM Act's LPA requirements.

74. TCP consequently found itself in the impossible position of being required by the CRC to produce a fully executed LPA while lacking the practical ability to have any labor organization to execute such an agreement.

75. By, upon information and belief, intentionally interfering with TCP's prospective contractual relationships and ability to obtain a replacement LPA, UFCW Local 360 has caused and continues to cause substantial harm to TCP, including the imminent threat of license suspension, non-renewal, or revocation. Such conduct constitutes tortious interference with prospective economic advantage and has created an immediate threat of irreparable harm to TCP's business operations.

**C. THE COMMISSION THREATENS TCP'S LICENSE**

76. On May 27, 2026, the United States District Court for the District of New Jersey held that Curaleaf Holdings, Inc. and Curaleaf NJ, II, Inc. were likely to succeed on the merits of their claims that the CREAMM Act's LPA provisions were preempted under both *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959) and *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Empl. Rels. Comm'n*, 427 U.S. 132 (1976), "*Garmon*" and *"Machinists*," respectively. *Curaleaf Holdings, Inc. v. N.J. Cannabis Regulatory Comm'n*, No. 25-16397, 2026 WL 1481529, at *10-14 (D.N.J. May 27, 2026).

77. As to *Garmon*, the District of New Jersey explained, "[s]tates may not regulate activity that the NLRA protects, prohibits or arguably protects or prohibits" and that "the *Garmon*

rule prevents [s]tates not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own judicial remedies for conduct arguably prohibited by the [NLRA]." *Id.* at *10 (*quoting Wis. Dep't of Indus., Lab.. & Human Rels. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)).

78. Accordingly, the District of New Jersey explained that the CREAMM Act's LPA requirement either "short-circuits" the NLRA's processes or "forces" negotiation over matters not required by Congress, including denying licensees their legal right to NLRB-supervised elections, condition licensure of execution of a LPA, and compelling negotiation over a topic federal law leaves optional. *Id.* at *12.

79. This forces licensees "to surrender other rights in the collective bargaining process" and "impermissibly conditions a state license on an employer 'refraining from conduct protected by federal labor law,' which 'chills one side of the robust debate which has been protected under the NLRA." *Id.* (*quoting Casala, LLC v. Kotek*, 789 F. Supp. 3d 1025, 1039 (D. Ore. 2025) (*quoting Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 73 (2008)).

80. As to *Machinists*, the District of New Jersey explained the blatantly obvious fact that "Congress intentionally left certain aspects of labor-management relations 'unregulated,' to be 'controlled by the free pay of economic forces.'" *Id.* at *13 (*quoting Machinists*, 427 U.S. at 140). The Court continued that while "[r]esort to economic weapons should more peaceful measures not avail" and "the use of economic pressure by the parties to a labor dispute is…part and parcel of the process of collective bargaining," the State of New Jersey "may not prohibit the parties' ability to use such weapons." *Id.* at *14 (*quoting Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 317 (1965); and then quoting *NLRB v. Ins. Agent's Int'l Union, AFL-CIO*, 361 U.S. 477, 495 (1960)).

81. Based on well-settled precedent, the District of New Jersey made clear that the CREAMM Act's LPA provisions enable the State Defendants to strip licensees of their legal right to use economic weapons. *Id.* Accordingly, "conditioning license renewal on signing a LPA…seeks to regulate the relationship between unions and employees…upset[ting] the balance Congress struck in passing the NLRA. *Id.* (*quoting Casala*, 789 F. Supp. 3d at 1031).

82. Despite the District of New Jersey's clear holding - - and notwithstanding an utterly frivolous appeal to the United States Court of Appeals for the Third Circuit - - Defendant Commission continues to effectively condition TCP's continued licensure on the unilateral willingness of a private labor organization to execute an agreement with TCP.

83. On or about July 28, 2026, the Commission, through Defendant Wallace, wrote to TCP, stating:

> The CRC has been informed that the LPA The Cannabis Place 420 has with UFCW has been terminated. To continue processing your license renewal application, the CRC needs you to submit a fully executed LPA from a different Union. Thank you for your attention to this matter.

[Orduna Decl., ¶ 46; Exhibit H].

84. On July 29, 2026, TCP gave the Commission written notice that:

> Since issuing its termination notice, TCP has actively sought to secure a replacement [LPA] to maintain compliance with New Jersey's cannabis licensing requirements. However, TCP has encountered a significant obstacle. [CEED], despite discussions concerning a potential [LPA], has declined to execute an agreement with TCP. The Company has reason to believe that UFCW's influence and involvement in the cannabis labor community have played a substantial role in CEED's refusal to move forward.
>
> The practical effect of this conduct is significant. Rather than allowing TCP to satisfy its statutory obligations freely through the labor organization of its choosing, UFCW appears to be attempting to foreclose TCP's ability to obtain a replacement LPA…Such conduct effectively seeks to force TCP back into a relationship with

> UFCW and to compel acceptance of bargaining positions and contractual terms that are inappropriate given TCP's status as an independently owned, diversely owned cannabis dispensary operating under a business model materially different from that of the large multi-state operators whose agreements UFCW has sought to impose.

[Orduna Decl., ¶ 47; Exhibit I].

85. TCP, again through counsel, asked Defendant Wallace to advise TCP whether other "bona fide cannabis labor organizations", other than the three (3) previously named, could execute a CREAMM Act-compliant LPA. [*See* Exhibit I].

86. The Commission ignored TCP until September 22, 2026, when it wrote to TCP, stating:

> Until there is a decision from the United States Court of Appeals for the Third Circuit in Curaleaf Holdings Inc. v. New Jersey Cannabis Regulatory Commission, Case No. 26-3067 (3d Cir. 2026), it is our understanding that cannabis licensees who seek license renewals from the New Jersey Cannabis Regulatory Commission without active Labor Peace Agreements (LPAs) with bona fide labor organizations will be renewed. ***However, if licensees do not have active LPAs, Notices of Violation (NOVs) for failure to maintain an LPA will be sent simultaneously with any renewal***. While the NOVs will be issued, the NOVs will state that no fines will accrue until the Third Circuit issues a decision. After the Third Circuit issues its decision, the New Jersey Cannabis Regulatory Commission will take appropriate action thereafter.

[Orduna Decl., ¶ 49; Exhibit J].

87. On September 21, 2026, the CRC required TCP to complete the Affidavit of Labor Compliance pursuant to 17:30-9.4(g), which requires cannabis businesses to verify that TCP entered into an LPA with a bona fide labor organization that is actively engaged in representing or attempting to represent the Licensee's employees, in compliance with the CREAMM Act. [Orduna Decl., ¶ 94; Exhibit R].

88. The CRC's continuing enforcement of the LPA requirement, while labor organizations allegedly coordinated by or acting under the influence of UFCW Local 360 refuse to execute replacement agreements with TCP, has placed TCP in an impossible regulatory position. TCP is effectively required to obtain the consent of private third parties to maintain its state-issued license, yet those same parties can arbitrarily withhold that consent. As a result, TCP faces the imminent loss of its license and destruction of its business through circumstances entirely outside of its control. Equity requires immediate intervention because no amount of diligence, negotiation, or good-faith effort by TCP can overcome a coordinated refusal by the limited universe of labor organizations capable of satisfying the CRC's requirements. The resulting loss of licensure, goodwill, customer relationships, employees, and ongoing business operations constitutes irreparable harm for which no adequate legal remedy exists.

89. Indeed, the facts of this case demonstrate the precise danger identified by the District Court in *Curaleaf Holdings, Inc.*, *supra*.

90. By conditioning continued licensure upon execution of an LPA with a "bona fide labor organization," the State Defendants have conditioned compliance with the CREAMM Act on licensees' willingness to acquiesce to the whims of a select few "bona fide labor organizations."

91. If those "bona fide labor organizations" enjoying most favored nation status refuse to execute an LPA they can prevent a licensee from continuing its business operations.

92. Such a system directly interferes with the balance of economic forces protected by federal labor law and imposes the type of labor-relations obligation that the NLRA expressly reserves to the free choice of employees, employers, and labor organizations recognized by Section 2(5) of the NLRA.

## D. A NOV FROM THE COMMISSION WILL CAUSE IRREPARABLE HARM

### 1. A NOV Will Cause Irreparable Harm to TCP's Banking Relationships

93. TCP banks with a cannabis-compliant financial institution, operating under the Bank Secrecy Act and the Financial Crimes Enforcement Network ("FinCEN"). [Orduna Decl., ¶ 51].

94. FinCEN files periodic "Marijuana Limited" Suspicious Activity Reports, documenting TCP's compliance status. [Orduna Decl., ¶ 52; Exhibit K].

95. A NOV signals a state regulatory violation that may prompt TCP's banking partners to reevaluate TCP's compliance status and file a "Marijuana Priority" Suspicious Activity Report.

96. Since TCP's banking account documentation requires it to maintain licensure in good standing a NOV-triggered "Marijuana Priority" Suspicious Activity Report can place TCP's banking relationships and access to depository and payment services in jeopardy of termination.

97. TCP's access to depository and payment services are critically important to TCP's ability to operate its business because adult use recreational cannabis dispensaries are cash-intensive operations.

### 2. A NOV Will Cause Irreparable Harm Under TCP's Lease

98. TCP's lease for 1542 John F. Kennedy Boulevard requires that it, "at its sole expense, [to] comply with all local, state and federal laws. [Orduna Decl. ¶ 56; Exhibit L].

99. A NOV constitutes a finding by the Commission that TCP has violated state law.

100. A violation of state law allows TCP's landlord to pursue possession and damages, jeopardizing the very premises on which TCP's license and business depend. [Orduna Decl., ¶ 58].

101. A violation of state law also allows TCP's landlord a contractual remedy of applying TCP's $12,800 security deposition, on ten (10) days' notice, toward any such default. [Orduna Decl., ¶ 59].

**3. A NOV Will Cause Irreparable Harm to TCP's Ability to Operate in Jersey City**

102. The CREAMM Act, *N.J.S.A.* 26:I-45(b) grants New Jersey municipalities explicit powers to authorize or prohibit specific classes of cannabis businesses within their borders, determine the number of dispensaries or other cannabis establishments allowed to operate, and to regulate the location, manner, and hours of operations of these business, subject to local zoning authority.

103. Since TCP operates in the City of Jersey City, its license "must be renewed annually" with the municipality under § 84-52(C) of the Municipal Code of the City of Jersey City ("JC Code").

104. Pursuant to §§ 24-078 & 84-52(D)(2) of the JC Code, renewal will be granted only upon "[p]roof the cannabis establishment…will be operated pursuant to all local and state regulations."

105. § 84-51 of the JC Code establishes and creates the Jersey City Cannabis Control Board ("JCCCB").

106. § 84-51(2) of the JC Code makes JCCCB "responsible for reviewing applications for operations of Cannabis Establishments and Cannabis Dispensaries and applications for the operation of cannabis consumption areas."

107. § 85-51(2)(c) of the JC Code authorizes JCCCB to review applications for license renewals and to make written recommendations to the City Council of the City of Jersey City as to application outcomes.

108. TCP therefore cannot continue its operations at 1542 John F. Kennedy Boulevard, Jeresy City, New Jersey 07305 without the approval of the City Council of the City of New Jersey.

109. Critically, §84-51(2)(e)(i) requires JCCCB's application review to consider "whether the business has received notices of violation from any enforcing authority."

110. TCP's license to operate in Jersey City comes before JCCCB in late October 2026.

111. An active, unresolved NOV can result in JCCCB recommending that the City Council of the City of Jersey City deny TCP a license.

**4. A NOV WILL CAUSE IRREPARABLE HARM TO TCP'S APPLICATION FOR A CANNABIS CONSUMPTION AREA**

112. § 84-53(A) of the JC Code allows the City of Jersey City to authorize the operation of "locally endorsed" cannabis consumption areas, operated by cannabis retailers, at which on-premises consumption of personal use cannabis may occur.

113. § 84-53(B)(a)(2) of the JC Code requires "local endorsement for a cannabis consumption area, in the from of a resolution recommending support approved by [JCCCB] and adopted by the Jersey City Municipal Council."

114. Under §§ 24-078 & 84-53(D) of the JC Code, JCCCB "may deny or revoke the endorsement and/or the Cannabis Consumption Area License for good cause," which includes any failure "to comply with…any of the terms, conditions or provisions of this Chapter or related rules and regulations, rules or regulations."

115. JCCCB endorsements for Cannabis Consumption Areas are capped at six (6) for the entire City of Jersey City and one per each ward of Jersey City.

116. Any blemish on TCP's compliance record irreparably harms its ability to obtain a scarce endorsement for a Cannabis Consumption area in a highly competitive environment. [Orduna Decl., ¶ 74].

**5. A NOV WILL IRREPARABLY HARM TCP'S RELATIONSHIP WITH ITS WHOLESALE SUPPLIERS**

117. TCP maintains relationships with several cannabis product wholesale suppliers. [Orduna Decl., ¶ 75].

118. Without these relationships, TCP will not be able to lawfully purchase inventory. [Orduna Decl., ¶ 76].

119. TCP cannot earn revenue if it does not have inventory to sell. [Orduna Decl., ¶ 77].

120. In New Jersey, wholesale cannabis supply agreements uniformly condition performance on TCP's continued regulatory compliance. [Orduna Decl., ¶ 78].

121. TCP's agreements with its wholesale suppliers permit the suppliers to terminate their agreements if TCP becomes non-complaint with CRC. [Orduna Decl., ¶¶ 79-87; Exhibits M-Q].

122. Loss of any of these supply relationships caused by a NOV would cause irreparable harm by cutting off TCP's cannabis product inventory. [Orduna Decl., ¶ 87].

**6. A NOV WILL CAUSE IRREPARABLE HARM TO PUBLIC PERCEPTION OF TCP**

123. TCP makes every effort to maintain an accurate public perception of its mission, goals, and standard of operation. [Orduna Decl., ¶ 88].

124. TCP depends on its carefully maintained reputation to meet its social equity goals and operate its business. [Orduna Decl., ¶ 89].

125. Issuance of a NOV will cast TCP in a false light as a "lawbreaker" and irreparably harm TCP's hard earned public image. [Orduna Decl., ¶ 90].

**7. A NOV WILL CAUSE IRREPARABLE HARM TO TCP'S BUSINESS VALUATION**

126. Issuance of a NOV will cast TCP in a false light as a "lawbreaker" and irreparably harm TCP's hard earned public image. [Orduna Decl., ¶ 91].

127. A NOV will imperil TCP's very ability to simply exist and, therefore, its business valuation. [Orduna Decl., ¶ 92].

**E. TCP's LICENSE RENEWAL**

128. On October 2, 2026, TCP submitted a license renewal application to the Commission. [Orduna Decl., ¶ 96; Exhibit S].

129. TCP paid the Commission a $10,000 fee to process its renewal application. [Orduna Decl., ¶ 97].

130. TCP's license expires on October 9, 2026 at 11:59 p.m. [Orduna Decl., ¶ 98].

131. Unless enjoined, the CRC's threatened suspension, non-renewal, or revocation of TCP's license will force TCP to cease operations, terminate employees, lose customers and goodwill, default on business obligations, and suffer injuries that cannot be adequately compensated by money damages.

132. The CRC has provided TCP with no workable alternative to maintain its license, and TCP has exhausted all reasonably available avenues to obtain a LPA. Through no fault of its own, TCP has been placed in an impossible compliance position.

## CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT
**(Against the State Defendants)**

133. Plaintiff incorporates Paragraphs 1 to 132, above, as if set forth fully herein.

134. The Declaratory Judgment Act grants this Court the authority to declare the rights and legal relations of parties where an actual controversy exists. 28 *U.S.C.* §§ 2201, 2202.

135. Declaratory relief is appropriate here because: (a) an actual controversy exits between Plaintiff and the State Defendants because they continue to enforce statutory and regulatory provisions condition licensure on entry into LPA with a "bona fide labor organization;" and (b) the LPA provisions of the CREAMM Act, as established by *Curaleaf Holdings, Inc.*, are voidable as stemming from an invalid state law.

136. Plaintiff contends that the CREAMM Act's LPA provisions are preempted by the NLRA and may not lawfully be enforced against Plaintiff.

137. The State Defendants, in willful defiance of the authority of this Court, continue to treat maintenance of LPA as an ongoing and material condition of licensure and to assert the authority to impose adverse licensing consequences for failure to maintain and comply with a LPA.

138. The controversy between Plaintiff and the State Defendants is concrete and imminent. By their actions, the State Defendants have unlawfully coerced either enter into LPA with UFCW Local 360, or face adverse licensure consequences.

139. On October 9, 2026 at 11:59 p.m., Plaintiff's license will expire. If this license is not renewed, Plaintiff will face adverse license consequences and suffer significant harm to its business.

**<u>COUNT II: VIOLATION OF 42 U.S.C. § 1983</u>**
**(Against the State Defendants)**

140. Plaintiff incorporates Paragraphs 1 to 139, above, as if set forth fully herein. 42 *U.S.C.* § 1983 guarantees that no citizen of the United States or persons within its jurisdiction will be deprived "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

141. Any person responsible for such a deprivation of such rights "shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress." *Id.*

142. The NLRA is a federal law, conferring rights on employers, employees, and labor organizations.

143. As an employer, TCP enjoys the protection of the NLRA.

144. TCP's license and right to renewal are protected property interests.

145. The State Defendants exercise the authority and/or apparent authority of the State of New Jersey and act under color of law.

146. The State Defendants' acts and omissions, as alleged herein, deprive Plaintiff of its protected property interest in its license.

147. The State Defendants' acts and omissions, as alleged herein, are arbitrary, capricious, and oppressive actions government acts or omissions.

148. The State Defendants' acts and omissions, as alleged herein, are the direct and proximate cause of Plaintiff's injuries.

**COUNT III: TEMPORARY RESTRAIING ORDER AND PRELIMINARY INJUNCTION**
**(Against the State Defendants)**

149. Plaintiff incorporates Paragraphs 1 to 148, above, as if set forth fully herein. Plaintiff is likely to succeed on the merits because the LPA requirement is preempted by federal labor law, as established by *Curaleaf Holdings, Inc.*

150. Plaintiff faces imminent irreparable injury because loss of licensure and/or adverse licensure consequences would force Plaintiff to cease its operations.

151. Loss of licensure and/or adverse licensure consequences would jeopardize the jobs of approximately twenty (20) persons, who the CREAMM Act purports to protect.

152. TCP would lose customers, goodwill, and business opportunities incapable of restoration through monetary damages.

153. The balance of equities favors TCP.

154. The public interest favors continued operation of a licensed Service-Disabled Veteran-owned and Minority-owned business and sound enforcement of well-established preemption precedent.

**COUNT IV: TORTIOUS INTERFERENCE**
**(Against UFCW Local 360, Doe Defendants, and ABC Corp. Defendants)**

155. Plaintiff incorporates Paragraphs 1 to 154, above, as if set forth fully herein. Plaintiff's license and renewal interests confers a reasonable expectation of economic advantage as it permits Plaintiff to lawfully sell adult-use cannabis products in the State of New Jersey.

156. Plaintiff's prospective contractual and economic relationships with CEED, Teamsters-affiliated labor organizations, and any other bona fide labor organization capable of entering into a CREAMM Act-compliant LPA establish a reasonable expectation of economic advantage because they enable Plaintiff to maintain and renew its license.

157. UFCW Local 360 has full knowledge of Plaintiff's reasonable expectation of economic advantage.

158. Upon information and belief, UFCW Local 360, without justification or excuse, intentionally interfered with Plaintiff's reasonable expectation of economic advantage.

159. There is a direct and proximate causal relationship between the acts and omissions of UFCW Local 360 and the injuries suffered by Plaintiff.

160. Plaintiff faces loss or non-renewal of its license and has suffered damages in an amount to be established at trial.

**COUNT V: CIVIL CONSPIRACY**
**(Against UFCW Local 360, Doe Defendants, and ABC Corp. Defendants)**

161. Plaintiff incorporates Paragraphs 1 to 160, above, as if set forth fully herein.

162. Upon information and belief UFCW Local 360, together and in concert with the Doe Defendants and/or ABC Corp. Defendants, entered into an agreement with a common purpose to commit an unlawful act by unlawful means.

163. The common purpose of committing an unlawful act by unlawful means includes, without limitation, preventing Plaintiff from obtaining a LPA, and thereby its ability to renew and/or maintain its license.

164. Upon information and belief UFCW Local 360 took concrete steps to carry out a civil conspiracy.

165. TCP has suffered damages, in an amount to be determined at trial, and faces irreparable harm as a result.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Cannabis Place 420 Corporation asks for judgment against Defendants, and respectfully prays that the Court grant:

**A. Injunctive Relief**

a. Issuance of a Temporary Restraining Order enjoining the State Defendants from taking any action adverse to Plaintiff's license renewal interests;

b. Issuance of a Preliminary Injunction enjoining the State Defendants from taking any action adverse to Plaintiff's license renewal interests; and

c. Issuance of Permanent Injunction prohibiting enforcement of the LPA Provisions of the CREAMM Act against Plaintiff.

**B. Declaratory Relief**

a. A declaratory judgment that the LPA provisions of the CREAMM Act are preempted by the NLRA and cannot be used as a basis to deny licensure to an otherwise qualified applicant and/or license holder;

b. A declaratory judgment that the State Defendants may not rely on LPA provisions of the CREAMM Act as a basis to deny, condition, suspend, revoke, refuse to renew, or otherwise adversely affect Plaintiff's license, or otherwise impose any adverse regulatory or legal consequences on Plaintiff; and

c. A declaratory judgment that any LPA between Plaintiff and any "bona fide labor organization" are voidable at Plaintiff's option and impose no obligations of any kind on Plaintiff after Plaintiff withdraws.

**C. Damages**

a. An award of compensatory damages, in an amount to be determined at trial, against UFCW Local 360;

b. An award of punitive damages, in an amount to be determined at trial, against UFCW Local 360;

c. An award of attorneys' fees and costs pursuant to 42 *U.S.C.* § 1983 and any other applicable law; and

d. Such other and further relief as this Honorable Court deems just equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all within issues so triable.

Respectfully submitted,

**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
*Attorneys for Plaintiff the Cannabis Place 420 Corp.*

By: ***_____/s/ Keya C. Denner_____***
Keya C. Denner, Esq.
Matthew T. Clark, Esq.
6 Campus Drive, Suite 305
Parsippany, New Jersey 07054
Tel. (908) 758-2785
Email: kdenner@constangy.com
mclark@constangy.com

Dean Kpere-Daibo, Esq. [*Pro Hac Vice* Movant]
4240 Duncan Avenue, Suite 200
St. Louis, Missouri 63110
Tel. (314) 338-3740
Email: dkdaibo@constangy.com

Dated: October 5, 2026

Document Group ID: 93de71df583e44b697b01fbf0e4ec578852e5f7f

**VERIFICATION**

I declare under penalty of perjury that the allegations set forth in the foregoing *Verified Complaint for Declaratory Relief, Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction*, except for those made upon information and belief which I believe to be true, are true and correct.

Osbert Orduna

________________________

Osbert Orduna

Dated: October 4, 2026

**<u>CERTIFCATION PURSUANT TO *L. CIV. R.* 11.2</u>**

The undersigned counsel for Plaintiff certifies that to the best of his knowledge and belief, the issues and controversies set forth in the above-entitled action are not subject to any action pending in any court, or of any pending arbitration or administrative proceeding.

Respectfully submitted,

**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**
*Attorneys for Plaintiff the Cannabis Place 420 Corp.*

By: _____***/s/ Keya C. Denner***_____
Keya C. Denner, Esq.

Dated: October 5, 2026

signNow

## Document History

SignNow E-Signature Audit Log

All dates expressed in MM/DD/YYYY (US)

**Document name:** TCP - NJCRC Lawsuit - Verified Complaint For Client Signature
**Document created:** 10/05/2026 02:35:53
**Document pages:** 30
**Document ID:** 17491a19f6f54b2a8c5cc2f1d6f7efcc4a15bed9
**Document Sent:** 10/05/2026 02:36:32 UTC
**Document Status:** Signed
10/05/2026 02:39:36UTC

---

**Sender:** mclark@constangy.com
**Signers:** osbert@thecannabisplace.org
**CC:**

| Client | Event | By | Server Time | Client Time | IP Address |
|---|---|---|---|---|---|
| SignNow Web Application | Uploaded the Document | mclark@constangy.com | 10/05/2026 02:35:53 am UTC | 10/05/2026 02:35:49 am UTC | 100.8.112.183 |
| SignNow Web Application | Viewed the Document | mclark@constangy.com | 10/05/2026 02:35:55 am UTC | 10/05/2026 02:35:55 am UTC | 100.8.112.183 |
| SignNow Web Application | Document Saved | mclark@constangy.com | 10/05/2026 02:36:26 am UTC | 10/05/2026 02:36:26 am UTC | 100.8.112.183 |
| SignNow Web Application | Invite Sent to: osbert@thecannabisplace.org | mclark@constangy.com | 10/05/2026 02:36:32 am UTC | 10/05/2026 02:36:31 am UTC | 100.8.112.183 |
| SignNow Web Application | Viewed the Document | osbert@thecannabisplace.org | 10/05/2026 02:36:57 am UTC | 10/05/2026 02:36:57 am UTC | 24.190.9.108 |
| SignNow Web Application | Viewed the Document | osbert@thecannabisplace.org | 10/05/2026 02:36:57 am UTC | 10/05/2026 02:36:57 am UTC | 24.190.9.108 |
| SignNow Web Application | Unfinished Document | osbert@thecannabisplace.org | 10/05/2026 02:39:33 am UTC | 10/05/2026 02:39:33 am UTC | 24.190.9.108 |
| SignNow Web Application | Signed the Document | osbert@thecannabisplace.org | 10/05/2026 02:39:36 am UTC | 10/05/2026 02:39:36 am UTC | 24.190.9.108 |
| SignNow Web Application | Viewed the Document | mclark@constangy.com | 10/05/2026 12:13:18 pm UTC | 10/05/2026 12:13:18 pm UTC | 108.53.160.54 |